IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ELI DEL SOLAR | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. WMN-13-2351 |
| WELLS FARGO FINANCIAL | * | |
| LEASING, INC. et al. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

Before the Court are two motions for summary judgment: one
filed by Defendant Wells Fargo Financial Leasing, Inc. (Wells
Fargo), ECF No. 32, and one filed by Defendants Crossroads
Advisors, Inc. t/a Re/Max Crossroads (Re/Max) and Glenn Ains.
ECF No. 36.  Upon review of the filings and the applicable case
law, the Court determines that no hearing is necessary, Local
Rule 105.6, and that both motions will be granted.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

As detailed more fully below, this case arose out of a
series of interactions between Plaintiff Eli del Solar and
Defendant Ains, who is a real estate agent employed by Defendant
Re/Max.  ECF No. 32-1.  Re/Max was hired by Defendant Wells
Fargo in January of 2011 to market 27160 Cash Corner Road,
Crisfield, Maryland 21817 (the Property),[1] a chicken farm that

---

[1] The address for the Property appears in the Complaint and
several other documents as 27100 Cash Corner Road.  The

was in Wells Fargo's possession as the result of a foreclosure proceeding. Plaintiff, who is Hispanic, was interested in the Property and, at one point, submitted a contract for its purchase. Ultimately, the farm was sold to a non-Hispanic couple, Thomas and Jacqueline Hornsby, for a significantly lower purchase price than that offered by Plaintiff. Plaintiff initiated this action, alleging that Defendants did not sell the farm to him because he is Hispanic.

The complaint contains two counts. Count I is brought under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968 as supplemented by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601 et seq. (the FHA). Count II alleges violation of Section 1981 of the Civil Rights Act of 1871, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981. This action was originally filed in the Circuit Court for Somerset County, Maryland on or about June 25, 2013. Wells Fargo removed the case to this Court on August 12, 2013, and Defendants Ains and Re/Max subsequently joined in that removal. After the close of discovery, Wells Fargo moved for summary judgment and Ains and Re/Max then filed a virtually identical motion of their own for summary judgment. The Court, agreeing with Plaintiff that Wells Fargo had raised new issues in its reply brief, permitted

---

Plaintiff has corrected the address in his subsequent pleadings and it is clear all parties are referencing 27160 Cash Corner Road as the property at the center of this action.

2

Plaintiff to file a Surreply, ECF No. 45, in further opposition to Wells Fargo's motion.  Both motions are now ripe.

## II. LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a party may be granted summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  As such, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 377 U.S. 317, 322 (1986).  A judge's role is to determine whether there are any genuine issues of fact that would affect the outcome of a trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Id.  Sufficient evidence requires there be more than "the mere existence of a scintilla of evidence on which the jury could reasonably find for the plaintiff;" rather, it must be enough that a fact finder could "reasonably find for the plaintiff."  Id. at 252.

## III. DISCUSSION

Housing discrimination claims, like other discrimination

3

claims, are subject to an adaptation of the now familiar McDonnell-Douglas[2] burden shifting scheme.  Sullivan v. Hernandez, 215 F. Supp. 2d 635, 638 (D. Md. 2002).  Accordingly, in order to survive summary judgment, a plaintiff asserting a claim under either the FHA or § 1981 must first establish a prima facie case showing that: (1) he was a member of a racial minority; (2) he applied for and was qualified for, or otherwise ready, willing and able to buy the property on the vendor's terms; (3) the vendor refused to sell the property to him; and (4) the property remained available for sale thereafter on terms similar to what he offered.  Mobley v. Russell, 297 F. Supp. 2d 835, 838-9 (D. Md. 2003) (citation omitted).  If a plaintiff establishes this prima facie case, the burden shifts to the defendant to present a legitimate, non-discriminatory reason for rejecting the plaintiff's offer and selecting a different purchaser.  Following the offer of a legitimate non-discriminatory reason, the burden shifts back to the Plaintiff to establish that the explanation is a pretext, such that it is "unworthy of credence."  Sullivan, 215 F. Supp. 2d at 638 (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 433 (2000)).

In their motions for summary judgment, Defendants challenge Plaintiff's ability to establish all but the first element of

---

[2] McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).

the prima facie case.[3]  Defendants note that Plaintiff never

applied for financing and did not proffer an expert to testify

that he would have qualified for financing, had he applied.

Furthermore, Defendants suggest that they demonstrated their

willingness to sell the Property to Plaintiff by presenting a

written counteroffer to Plaintiff's agent, Mickey Hayward.

Defendants further assert that the evidence establishes that

they actually would have preferred entering a contract with

Plaintiff as opposed to the Hornsbys had Plaintiff been willing

to meet the offer made by the Hornsbys.  Instead, Defendants

maintain, Plaintiff withdrew from the negotiations.  The

relevant facts are as follows.

    After obtaining the Property in January of 2011 through

foreclosure proceedings, Wells Fargo retained Re/Max and its

listing agent, Glenn Ains, to market the Property.  Shortly

thereafter, Ains obtained a contract from Simon and Hae Seng Kim

to purchase the Property for $905,000.  To facilitate the

contemplated sale, the Kims were substituted for Wells Fargo as

---

[3] Defendants do not concede, however, that Plaintiff would be
able to establish even the first element of the prima facie
case.  In its reply, Wells Fargo notes that Plaintiff offered no
evidence of his race, or even his national origin.  While
Plaintiff contends that his surname clearly reveals his
ethnicity, Defendants assert that making such an assumption on
that basis is "disturbing and unfounded."  ECF No. 32-1 at 17.
The Court will assume, for purposes of this decision, that
Plaintiff is Hispanic and that Defendants were aware of his
ethnicity.

the foreclosure purchasers on April 6, 2011.  The sale to the Kims failed to close, however, and a dispute arose between Wells Fargo and the Kims regarding the return of the Kims' $30,000 deposit.  Until that dispute could be resolved, the Kims refused to relinquish their status as substitute foreclosure purchasers. In the meantime, Ains began re-marketing the Property.

On or about May 28, 2011, Plaintiff, through his agent, Hayward, made an offer on the Property for a net purchase amount of $850,000.  A few days after Plaintiff submitted his offer, Wells Fargo notified Ains that it intended to present a counteroffer to Plaintiff of $905,000, the same purchase price offered by the Kims.  Ains informed Hayward of the proposed counteroffer and explained that the bank was looking for a contract at $905,000, because a contract for that amount would enable it to keep the Kim's deposit.

On June 16, 2011, Wells Fargo sent the written counteroffer of $905,000 to Hayward, who immediately forwarded it to Plaintiff.  Plaintiff responded that evening with an email to Hayward stating that he believed that even his offer of $850,000 "was/is a tad too high already."  Pl.'s Ex. 10.  The next morning, June 17, 2011, Hayward emailed Ains stating that Plaintiff was "sticking with his offer" of $850,000 because his projection of income from the property would not support any higher initial investment.  Ains Dep., Ex. 12.

On June 23, 2011, the Hornsbys submitted an offer to Ains for $875,000. Ains Dep. at 63; Ains Dep., Ex. 13. This offer, however, was contingent on the Hornsbys selling one of their other farms. While the listing agreement prohibited Ains from informing Plaintiff about this offer, Ains asked Hayward to encourage the Plaintiff to increase his offer, suggesting that Wells Fargo might accept a purchase price of $875,000. Ains Dep. at 52-54. On June 27, 2011, at 5:09 p.m., Plaintiff indicated in an email to Hayward that he would like to conditionally offer $875,000. Pl.'s Ex. 17. The offer was contingent on his ability to obtain flood insurance for $4,000 and also required that Wells Fargo pay for all electrical repairs and provide an Elevation Certificate to facilitate the insurance quote. Id. Plaintiff further stated in his email to Hayward, "[i]f it turns out that the insurance is more than what Mr. Ains stated, we can then renegotiate the price or void the contract. Between you and I, I'm fairly convinced that it will be more than that." Id. He closed that email by indicating that he was interested in looking at a different chicken farm later in the week.

Hayward responded at 5:41 p.m. that he would forward the offer on, Pl.'s Ex. 9, but a few hours later, at 8:58 p.m., Plaintiff sent another email to Hayward stating that he was "having second thoughts about paying even more," and instructed

7

Hayward not to convey the offer if he had not already done so. Id. In another email sent to Hayward the next morning, June 28, 2011, at 8:46 a.m., Plaintiff instructed "[i]f you have already told [Ains] about me accepting the 875 tell him that I've changed my mind about accepting that, 850 is my offer and I think it's already too high . . . . If they accept it OK, if they don't I'll go for the other farm which I am thinking is a better buy." Hayward Dep., Ex. 7.

On June 28, 2011, Ains made another attempt, through an email to Hayward, to persuade Plaintiff to match the Hornsbys' offer. Ains wrote, "I am confident that the [Property] will be under contract soon. The Farm could be his if he is willing to realize the fat has been trimmed to the fullest extent and there is no more room left to try and get a better deal." Pl.'s Ex. 14. Despite this attempt, on June 29, 2011, Hayward sent an email to Ains stating that "I just got word from [Plaintiff] that he wants to pull the offer on [the Property]. . . . Please email me to confirm that you received this, voiding the offer [Plaintiff] made on [the Property]." Ains Dep., Ex. 15.

About a month later, on July 19, 2011, after reaching an agreement with the Kims, Wells Fargo was reinstated as the foreclosure purchaser of the Property. ECF No. 32-1 at 13. The Hornsbys' offer of $875,000, contingent upon the sale of their farm, was the only existing offer, and on July 25, 2011,

8

Defendant Wells Fargo entered into a contract with them for a purchase of that amount.  That contract subsequently fell through, however, for a variety of reasons.  Ains Dep. at 87.

More than six months passed and Wells Fargo received no additional offers on the Property.  On or about February 9, 2012, the Hornsbys made a new offer on the Property for a purchase price of $804,000.  Ains Dep. at 87.  This contract was accepted by Wells Fargo and the sale was completed on March 30, 2012.

In the meantime, Plaintiff pursued the purchase of several other farms.  After negotiations or contracts on two other farms fell through, Plaintiff eventually purchased a farm in Berlin, Maryland for $310,435.  Comments made to Hayward during the course of looking at other farms point strongly to a lack of continued interest in the Property on the part of Plaintiff. Two days after withdrawing from negotiations with Wells Fargo, on July 1, 2011, Plaintiff referenced another farm he was considering and stated he would have been "really, really ticked" had he entered into a contract on the Property before finding out about this new farm.  Hayward Dep., Ex. 11.  On August 25, 2011, in an email regarding a different farm, Plaintiff indicated that he was "fairly disenchanted" with the Property, mostly because of insect infestations, but that if this new farm did not work out, he might offer $765,000 for the

Property.  While he doubted that Wells Fargo would take it, he indicated he wouldn't offer "a penny more for [the Property], if I'm going to go there and endure the place, it better be worth doing."  Hayward Dep., Ex. 12.

On or about April 11, 2012, Hayward sent an email to Plaintiff informing him that the Property had been sold for $804,000, but erroneously reported that the Property had been under contract since July 2011.  Pl.'s Ex. 29.  Based on the misunderstanding that the Property had sold under a contract that was entered into in July of 2011, and not March 2012, Plaintiff replied to Hayward, "[t]hey refused an $875k offer only to accept a $70k lower offer a few weeks later.  That borders on malpractice from these guys. . . .  I knew it was simply not possible to pay more for that farm, like I said back then, at that price it was too high already."  Id.[4]

---

[4] Plaintiff opines in his opposition that a subsequent sale for a significantly lower price than he had offered could only be a sign that this was an "'inside job' for personal gain" or was the result of discrimination.  ECF No. 38 at 5.  He then states that "[a]fter learning that Mr. Hornsby was a farmer with no ties to [Wells Fargo], the only possible explanation was discrimination."  Id.  While the Court does not adopt Plaintiff's conclusion that there are only two possible reasons for the lower sale price, that Court notes that Plaintiff alleges that Ains, who is also a farmer, purchased one of the Hornsbys' farms, thus permitting the Hornsbys to qualify for financing the purchase of the Property.  Id. at 16-17.  Again, without adopting Plaintiff's conclusion, this would seem to be the type of "inside job" that Plaintiff recognizes as an alternative motivation to discrimination.

With this history in mind, the Court returns to the
elements required to establish a prima facie case of housing
discrimination under the FHA or § 1981.  The Court has already
indicated that it will assume, for purposes of this opinion,
that Plaintiff is a member of a protected class and that
Defendants were aware of his ethnicity and, thus, Plaintiff
could establish the first element.  The Court also concludes
that Plaintiff would be able to establish the fourth element,
i.e., that the property remained available for sale under terms
similar to what Plaintiff had offered.  The Court, however,
finds no evidence in support of the second or third elements.

The second element requires that the purchaser applied for
and was qualified for, or was otherwise ready, willing, and able
to purchase the property on the vendor's terms.  It is
undisputed that the Plaintiff never officially qualified for
financing to purchase the Property because Plaintiff's source of
financing required a signed contract to proceed with approval of
a loan.  While Plaintiff alleges that he possessed sufficient
cash reserves for a significant deposit and opines that he would
have qualified for a loan to purchase this property, this is the
type of opinion that would typically require the testimony of an
expert.  See Cooley v. Sterling Bank, 280 F. Supp. 2d 1331, 1340
(M.D. Al. 2003).

Additionally, the evidence demonstrates that at no time

during the negotiations was Plaintiff willing to buy the
Property on the terms sought by Wells Fargo at that time.  When
Wells Fargo was seeking $905,000 in order to preserve its claim
over the Kims' deposit, Plaintiff rejected that counteroffer,
indicating he would "stick with" his original offer of $850,000.
When Wells Fargo was attempting to get Plaintiff to match the
Hornsby's offer of $875,000, Plaintiff initially communicated to
his own agent, Hayward, that he would conditionally offer
$875,000.  There is no evidence that Hayward ever communicated
that offer to Ains or Wells Fargo and, even if he did, Plaintiff
never submitted that offer in written form and it is clear from
his subsequent communications with Hayward that he was not
inclined to do so.  Plaintiff then chose to withdraw even his
original offer of $850,000 and, instead, pursued alternative
properties.  Shortly after withdrawing from any negotiations
with Wells Fargo, Plaintiff's comments to Hayward indicated that
he was unwilling to offer more than $765,000 for the Property.[5]

In opposing the motions for summary judgment, Plaintiff
rests heavily on his contention that he made "a verbal offer of

---

[5] In his Surreply, Plaintiff suggests that "putting down the
Property was [his] way of dealing with the loss of what he knew
should have been his."  ECF No. 45 at 10.  No reasonable jury,
however, could infer that Plaintiff, in sending an email to his
own agent highlighting the Property's infestations of "ticks,
chiggers and tons of other blood sucking insects" that he would
need to "endure" should he purchase that farm, was somehow his
lamenting a loss.

$875,000 that was kept open for four or five days before it was withdrawn." ECF No. 45 (Pl.'s Surreply) at 3; see also ECF No. 38 (Pl.'s Opp'n) at 11-13.  As evidence that the verbal offer was extended, Plaintiff points to the following language in his June 27, 2011, 8:58 p.m. email to Hayward: "If you have told him and it turns out there are issues with the other [farm] I'll send you the document on Thursday, after I have seen the other farm.  I'm thinking I may want to pull out of [the Property] and go for the other one instead." ECF No. 38 at 13 (citing Pl.'s Ex. 9).  Plaintiff explains that "the document" to be sent on Thursday [,June 30, 2011,] referred to a signed contract for the Property for $875,000.  Id.  Plaintiff suggests that this indicates that he was still contemplating submitting a written offer of $875,000.

Plaintiff also points to an email he sent to Hayward on June 28, 2011 at 4:06 p.m., as evidence that "work on the $875,000 offer was still being done and considered." ECF No. 38 (citing Pl.'s Ex. 23).  The email asks Hayward to call Ains to get the electric turned on at the Property so that an assessment can be made of the needed repairs.  The email closes with, "[w]e'll need to extend our deadline until this gets done, since I don't know the size of this expense I may decide to accept their 875 offer assuming this is not all that large.  Do verify that the 875 figure is an actual figure I can count on or is it

13

just [Ains] shooting from the hip." Pl.'s Ex. 23 (emphasis added).

The Court concludes that neither email supports the conclusion that Plaintiff extended "a verbal offer of $875,000 that was kept open for four or five days before it was withdrawn."[6] At best, the evidence shows that, on June 27, 2011, Plaintiff instructed Hayward to extend a verbal offer that may or may not have ever been conveyed to Ains. On June 29, 2011, Plaintiff withdrew even his written offer of $850,000.

---

[6] In his opposition, Plaintiff states that "[o]n or about June 25, 2011 following Mr. Ains [sic] suggestion[,] the Plaintiff spoke with his real estate agent instructing him to make a verbal offer of $875,000." ECF No. 38 at 9. As support for this proposition, Plaintiff states in a footnote, "[s]ee email evidence of xx/xx/xx were [sic] Plaintiff refers to the offer of $875,000 as having been made and note that there is no response from Mr. Hayward asking 'what are you talking about?', clearly he knew that a verbal offer of $875,000 had been communicated to Mr. Ains and was awaiting his response." ECF No. 38 n.7. In his Surreply, Plaintiff explains that the intended date of the email was 06/27/2011. Any conclusion that Plaintiff had made an offer on June 25 is completely inconsistent, however, with the emails of the afternoon of June 27 where Hayward tells Plaintiff that Ains "just called" and stated that Wells Fargo said they would not take less than $875,000 and Plaintiff then instructs Hayward, "tell [Ains] OK, I'll go up to $875k." Pl.'s Ex. 17.

Similarly, Plaintiff in his Surreply misstates the date on which the Hornsbys submitted their offer of $875,000. Plaintiff argues, "[Plaintiff's] offer of $875,000 that met all of [Wells Fargo]'s terms was made on or about June 25th, 2011 two days before the offer of $875,000 was submitted by the Hornsbys." ECF No. 45 at 3. Plaintiff offers no support for his conclusion that the Hornsbys' offer came two days after, and not two days before, Plaintiff's. The only evidence in the record indicates that the Hornsbys' offer was submitted on June 23, 2011. Ains Dep. at 63 and Ex. 13.

Expressions in the meantime of an intent to submit a written
contract if it turns out another property he was considering had
issues or if repair expenses on the Property do not exceed some
undisclosed amount are not consistent with an extended offer
that could have been accepted by Wells Fargo.  Furthermore,
Wells Fargo had previously conveyed to Plaintiff that it would
not consider any offers unless they were in writing.  See Pl.'s
Ex. 8 (May 26, 2011, email from Hayward to Plaintiff, relaying
that Ains had reminded Hayward that Wells Fargo would not agree
to anything before they got it in writing).

        The evidence clearly shows that Plaintiff was never willing
to purchase the Property on Wells Fargo's terms and, thus,
Plaintiff is unable to establish the second element of his prima
facie case.  The evidence also fails to support the third
element of Plaintiff's prima facie case, i.e., that Wells Fargo
refused to sell him the property.  In fact, the evidence shows
that Wells Fargo clearly wanted to sell the Property to
Plaintiff.

        After the Plaintiff provided an initial offer of $850,000
for the Property, Defendant Wells Fargo promptly extended a
written counteroffer of $905,000 to the Plaintiff.  In a June
13, 2011, email from Ains to Wells Fargo's employee Ray Fuller,
Ains stated that they wanted to make the counteroffer to
Plaintiff swiftly in order to "get the ball rolling and not lose

15

this guy." Ains Dep., Ex. 8. While Plaintiff complains that this was a price above that which the farm could support and, thus, Wells Fargo was "effectively refusing to sell" the Property to him, ECF No. 38 at 4, the evidence shows that this price was driven, not by any racial animus, but by the unresolved dispute with the Kims.

When the issue with the Kims was resolved and Wells Fargo received the initial offer from the Hornsbys for $875,000, the evidence shows that Wells Fargo encouraged Plaintiff to match that price so that it could sell the Property to Plaintiff. Plaintiff acknowledges that Ains actively encouraged him to match the Hornsbys' offer. ECF No. 38 at 9. Kipp Weaver, a Wells Fargo Regional Vice President involved in the attempt to sell the Property, testified that, had Plaintiff matched the Hornsbys' $875,000 offer, he would have preferred and would have accepted Plaintiff's offer because Plaintiff's contract, without the contingency for the sale of another property, was a "cleaner contract." Weaver Dep. at 120.

Plaintiff's last line of argument for the conclusion that Wells Fargo refused to sell him the Property is premised on his opinion that, "[i]f [Wells Fargo]'s intent was in fact to get the most they could for the Property, then, it would have made sense to contact the highest bidder for the Property and ask if he was still interested in purchasing it." ECF No. 38 at 5; see

16

also id. at 25 ("If the original contract with Mr. Hornsby did
fall through on September 10, 2011 [Wells Fargo] had five months
to make a simple phone call to ask if the highest bidder on the
Property was still interested."). There is no evidence in the
record, however, that Plaintiff ever requested that he be
contacted to make an additional offer on the Property should
circumstances change. In Hayward's email to Ains withdrawing
Plaintiff's written contract for $850,000, there is no hint of
continued interest on the part of Plaintiff. To the contrary,
Hayward suggested, "[m]aybe I can sell it to someone else if you
don't before I do. In the meantime, I'm working with many other
poultry farm buyers who will want to be seeing your listings."
Ains Dep., Ex. 15 (emphasis added).

Furthermore, there is no reason to believe that Plaintiff
would have responded positively had he been contacted. As noted
above, once he withdrew from negotiations, Plaintiff expressed
considerable disenchantment with the Property. As of August 25,
2011, Plaintiff had indicated to his own agent that he "wouldn't
offer a penny more" than $765,000 for the Property. Despite
these comments clearly declaring his lack of interest, Plaintiff
suggests in his Surreply that "two facts specifically prove that
Plaintiff was interested on the Property after he withdrew from
negotiations due to [Wells Fargo]'s statement via Mr. Ains that

$905,000 was the bottom line."[7]  ECF No. 45 at 10.  One of those
facts was that the Property was the only farm that Plaintiff
"put down."  The Court has already addressed the questionable
logic that denigrating a property is a sign of continued
interest.  See, supra, n.5.  The other fact cited by Plaintiff
was that he asked Hayward to keep him apprised as to what
happened to the Property.  What Plaintiff apparently requested,
however, was for Hayward to "'keep an eye on the farm and let me
know what it sells for.'"  ECF No. 45 at 10.[8]  Requesting after-
the-fact sale information, however, is not evidence of the
desire to submit a new offer.

     While it may have been a prudent business practice for Ains
to cold call individuals who had previously expressed interest
in a particular property, there is no inference of
discrimination that arises from his failure to do so.  When the
Hornsbys made their new offer of $804,000, more than seven
months had passed since Plaintiff had expressed any interest in

---

[7] In this argument, Plaintiff misstates the record.  Plaintiff
was aware at the time he withdrew from negotiations that Wells
Fargo was looking for an offer of $875,000.  In an email he sent
to Hayward on June 28, 2011 at 4:06 p.m., Plaintiff states that
"I may decide to accept their 875 offer".  See Pl.'s Ex. 23.
While Plaintiff points to an email from Ains to Hayward sent
later that evening, Pl.'s Ex. 14, as evidence that Wells Fargo
would not accept less than $905,000, in that email Ains was
explaining Wells Fargo's basis for the original counteroffer,
not its current position.

[8] Plaintiff does not provide a citation for this quotation but
the Court will assume that it is accurate.

the Property.  There is no evidence that either Plaintiff, or Hayward on Plaintiff's behalf had made any contact with Ains in the meantime.  Ains, therefore, would not have known that Plaintiff was still looking for a farm to purchase or that he was still interested in the Property.

## IV. CONCLUSION

The Court concludes that there is no evidence from which a jury could find that Plaintiff was willing to buy the Property under the terms that Wells Fargo was seeking at the time Plaintiff was negotiating the sale, or that Wells Fargo would have refused to sell the Property to Plaintiff had he met its terms.  Plaintiff has failed to establish even a prima facie case of housing discrimination.  Accordingly, Defendants are entitled to summary judgment on both of Plaintiff's claims.

The Court notes that Defendants Re/Max and Ains filed a counterclaim against Plaintiff based on a clause in the contract Plaintiff signed when he made his original written offer on the Property in May 2011.  Re/Max and Ains contend that this clause "obligates and requires [Plaintiff] to indemnify and hold harmless Re/Max and Ains from any liability, loss, cost, damages or expenses (including court fees and attorneys' fees) incurred in this action provided that no judgment is entered against them in this action."  ECF No. 14 at 8.  While the Court is skeptical that this clause can be stretched to shift attorneys' fees in

this context, it will not close the case at this time.  Counsel

for Re/Max and Ains shall submit a status report to the Court

within ten days of the day of this Memorandum and Order

indicating whether the counterclaim will be pursued.  The jury

trial currently scheduled for October 14, 2014, will be taken

off the Court's calendar.

A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge



DATED: August 19, 2014